[No. 4398.]

## THE PEOPLE EX REL. THE ATTORNEY GENERAL v. OWERS.

|    |     |
|----|-----|
| 29 | 535 |
| 33 | 466 |

|    |     |
|----|-----|
| 29 | 535 |
| 36 | 129 |
| 36 | 130 |

1. QUO WARRANTO—PLEADING—BURDEN OF PROOF.

In *quo warranto* proceedings instituted by the state to determine the right to a public office, the burden of proof is always upon the defendant, to establish his right, and defendant must with particularity allege and prove all necessary facts, showing not only that he was eligible to the office at the time of his election, but also showing his continuing right to hold the office down to the time of the institution of the proceeding.

2. DISTRICT JUDGES—ELIGIBILITY TO OFFICE—ELECTORS—DOMICILE.

The requirement of section 16 article 6 of the constitution, that a person to be eligible to the office of district judge, shall at the time of his election be an elector within the judicial district is met by showing that at the time of election a district judge had his domicile or legal or constructive residence, as distinguished from his actual abiding place, within the district.

3. DISTRICT JUDGES—PERSONAL ATTENTION TO OFFICE—FORFEITURE.

The facts in this case are held not to constitute an abandonment of forfeiture of the office of district judge under section 2 article 12 or the constitution, which provides that no person shall hold any office or employment of trust or profit under the laws of this state, without devoting his personal attention to its duties, although defendant on the advice of physicians had been for some time living outside of his district, as much as possible.

4. DISTRICT JUDGES—RESIDENCE IN DISTRICT.

Section 29 article 6 of the constitution, which provides that all judicial officers excepting judges of the supreme court shall reside in the district, county, precinct, city or town for which they are elected or appointed, requires that a district judge shall maintain his actual residence in his district as distinguished from a legal or constructive residence or domicile. But where a district judge for eight months after the beginning of his term on account of his health and on the advice of physicians has lived out of his district as much of the time as his actual presence was not needed in the district, and it is his *bona fide* intention to return and maintain his actual residence in the district as soon as his health will permit although the time when he will be able

to return is not definite, it is held not sufficient to work a forfeiture of his office.

5. SAME.

The naked declaration of a district judge of his intention to maintain his actual residence in his district would not be conclusive of the question.

### Original Proceedings in Quo Warranto.

This information in *quo warranto* by the people of the state of Colorado, upon the relation of Charles C. Post, its attorney general, filed on the 9th day of September, 1901, charged that for eight months then last past the defendant, Frank W. Owers, had usurped and intruded into, and was unlawfully holding and exercising the office of judge of the district court of the fifth judicial district of the state of Colorado, and called upon him to answer by what warrant he claimed to hold and exercise the duties of the office.

Without stating in detail the contents of the pleadings, it is sufficient to say that from the information, the answer, and the replication, it appears that defendant bases his right to the office upon the following grounds, all of which are traversed by the people, and they constitute the issues of fact to be determined by the court:

First: That defendant possesses all the constitutional and statutory qualifications to hold the office in question, and that, at the general election held on the 6th day of November, 1900, he was elected thereto by a plurality of the legal votes cast, and afterwards the result of the vote was canvassed by the proper canvassing board, and a declaration by it made that he was duly elected, and a certificate so stating was issued to him,

Second: That he has devoted his personal attention to the duties of the office.

Third: That after qualifying, by taking the necessary oath, he was, on the 8th day of January, 1901, inducted into, and then entered upon the discharge of the duties of the office; and since that time he has done nothing to disqualify him from holding the same, and that, in particular, he has continued to reside within the judicial district.

The cause was submitted upon an agreed statement of facts which, so far as we deem them material, are here reproduced substantially as they are recited by defendant's counsel in their brief:

"Defendant went to Lake county in 1879 and thereafter became a citizen and elector of that county and resided there continuously from 1882 to November, 1894, and was at the general election in the last named month and year elected judge of the Fifth Judicial District for the term of six years, ending on the 8th day of January, 1901. He was eligible in every particular to be elected to said office, including the qualification of being an elector in said county and district, and he took the oath-of office and did all other things required by law to enter upon the duties of, and to hold said office, and in fact served and acted as judge of said district for the full term expiring on January 8, 1901.

"It is history that very serious labor troubles occurred in Lake county beginning in June, 1896, and continued into the spring of 1897.

"The duties imposed on him by reason of said labor troubles resulted in the impairment of his health and in nervous prostration, and that as the result thereof he was unable to sleep in such high altitude, and he was advised by physicians that his health and

life depended on his spending as much time as possible at an altitude less than Leadville, preferably at sea level.   Acting on said advice and in the hope of regaining his health, he passed most of the time until May, 1898, whenever he considered the duties of his office permitted, at altitudes less than Leadville, and principally in Denver, and found that he could sleep better at lower altitudes.

"Defendant was married in October, 1897, at Washington, D. C., and shortly after such marriage brought his wife to Denver, living with her at the residence of Dr. Hershey, 1311 Sherman avenue, until April, 1898.   In May, 1898, on the advice of his physicians, he went with his wife to Santa Barbara, Cal., which place is on the sea coast, where they remained five months, for the benefit of his health.

"Defendant, if called upon, would testify that on his return he found he was still unable to sleep over three or four hours a night at such altitudes as Leadville, and, therefore, continued to pass all the time he considered his official duties permitted, in Denver, the altitude of which city is 5,000 feet less than that of Leadville.

"Upon their return they boarded at 1311 Sherman avenue, Denver, till June, 1899, when they, together with Dr. Hershey and family, rented and occupied the furnished house of Dr. Blickensderfer, in Denver, until the first of October, 1899, the two families keeping house therein, dividing the expenses between them.

"After leaving the Blickensderfer house October 1, 1899, defendant rented a furnished house at No. 1320 Race street, Denver, and kept house and lived there with his wife until the end of October, 1899, when his wife went east, remaining there until Feb-

ruary 1, 1900, and during his wife's absence, defend-
ant, when in Denver, boarded at the Denver Ath-
letic Club.  In February, 1900, defendant rented fur-
nished apartments in the Turck flats, corner Colfax
and High streets, Denver, in which he and family
kept house until July, 1900.  During the months of
July and August, 1900, defendant's wife was at Kiowa
Lodge, near Bailey's, in Platte canon, Colorado, dur-
ing which period defendant boarded at the Denver
Athletic Club, and on her return early in September,
1900, they lived at the family hotel known as the
Vallejo, No. 1420 Logan avenue, Denver.

"In December, 1900, defendant and family moved
into one of the apartments known as 'The Maples,
No. 1753 Grant avenue, Denver, renting it unfur-
nished, and which his wife furnished, and they kept
house therein, and, ever since the time last men-
tioned, have continuously occupied said apartments
up to the present time, renting the same from month
to month, except during the months of May, June,
July, and August, 1901, defendant's wife was in the
east, and during these months he boarded at the
Denver Athletic Club.  That since February, 1900,
and in 1901, and up to the time of filing the informa-
tion herein, defendant has, when in Denver, occupied
an office in said city at Nos. 67 and 68 Jacobson Build-
ing.  Said rooms are rented and maintained by the
Royalty Gold Mining and Milling Co., of which
company defendant is secretary.  This sign has
during all said time, been painted on the door of
room No. 68:

.'The Royalty Gold M. & M. Co.'

"And on room No. 67:

'The General Jourdan Mining Co.'

'Frank W. Owers.'

"The DenverCity Directory for 1900 contains the following:

" 'Owers, Frank W., lawyer, 67-68 Jacobson building.'

"And said directory for 1901 contains the following:

" 'Owers, Frank W., Sec. Royalty Gold Mining Company, 67-68 Jacobson building, r. 1753 Grant Ave.'

"But defendant would testify that both said insertions were made without his knowledge or direction.

"From the date of defendant's marriage to the present time the wife and family of defendant- have been in Lake county but once and then for less than ten days, during which time she visited at the home of a friend in Leadville.

"For two years and nine months immediately preceding the filing of this information, and for more than two years prior thereto, whenever defendant was in Lake county, he occupied, as his sleeping room, a room in the county court house, which said room is adjacent and adjoining to and is a part of the district court chambers. All the furniture in said court chambers (except that in the sleeping room), including carpets or rugs on said floors, is now the property of Lake county, and has been since on or about December 30, 1898, on which date the defendant sold the same to said county. All the furniture in the said sleeping room, including bedstead,

bedding, bureau, washstand and carpets, are the property of defendant, and are all the household goods owned by defendant in Lake county since the time aforesaid.

"Defendant has paid no rent for such room or either of them in the court house, but the same were subdivided, arranged, furnished with bath and toilet conveniences, and are lighted, heated and cared for by the county commissioners at the expense of Lake county. For two years and nine months prior to the filing of the information, defendant did not lease, keep or maintain any house or dwelling place in the fifth district, except as above stated, but he kept and now keeps his wardrobe in Denver, taking with him, whenever he goes into the fifth district, sufficient clothing to meet the necessities of a short stay, except that he has always kept in Leadville, what he considered sufficient personal linen and bed linen, blankets, etc., for his use when there, and he has always boarded and taken his meals at restaurants or hotels when in Leadville, and has had no regular boarding place during that time.

"It thus appears that prior to his marriage defendant occupied rooms in the court house in Leadville, by arrangement with the county commissioners, which rooms were furnished by defendant. While he was in Denver for his health, as above stated, he became married, and has kept his wife and family, and has himself stayed in Denver as much as possible. That soon after his marriage he sold to Lake county the furnishings of one of the rooms he had theretofore occupied, reserving the furniture in the sleeping room, keeping therein sufficient personal conveniences and sleeping therein when in Leadville, and taking his meals where convenient.

"Defendant has not returned any tax schedule of taxable property of any kind owned by him in Lake county, to the assessor thereof for either of the years 1898, 1899, or 1900, nor has he paid nor has he been assessed any tax on personal property in Lake county, for either of those years. But respondent has no property in said county or district, subject to taxation, other than real estate.

"Defendant paid and there was assessed against him, no poll or per capita tax in said county or district.

"Defendant has no property interest outside of the fifth district.

"During a period of two years and nine months, immediately preceding the filing of this information, the defendant has not been personally present within the fifth judicial district to exceed three hundred days, and that fifty of said days were devoted by him exclusively to matters connected with his candidacy for the office of district judge during a portion of the summer and fall months of 1900.

"During said last period defendant, upon the adjournment of court in any county of his district, when there was no other business requiring his presence in another county thereof, or unless he stayed longer for the transaction of his private business in the district, would immediately return to Denver, except in a few instances where he proceeded to other parts of the state. A schedule of the days when he actually held court in his district, for 1899, 1900, and part of 1901 appears in the printed record; also the dates when he held court in other districts, which show that from two-thirds to three-fourths of his time were spent out of his district. Defendant's residence on the list of registration of voters, in Lake county in

1896, appears as "Court House," and the same as to 1899 and 1900, and, the same residence appeared in the published list of candidates when defendant was a candidate in 1900.

"Defendant would testify that from 1882 to the present day he has always described himself in deeds and other legal documents as being of Lake county Colorado; that he has always so registered at hotels when traveling; that since said year he has rented and kept a postoffice box in the Leadville postoffice; that his personal envelopes are, and always have been since 1882, stamped and printed so that his letters may be returned to Leadville, Colo.

"And that on the 6th day of November, 1900, and for more than two years prior thereto, and that on the 8th day of January, 1901, and for more than two years prior thereto, he has claimed and now claims Leadville, Lake county, Colo., as his domicile and place of residence, and that he did reside during said period and now resides in Lake county, and ever since said dates he has resided in said county and district; that said place is his home and domicile; that whenever he has voted and exercised his prerogative as a citizen of the United States and of the state of Colorado, he has so voted in Leadville, Lake county, Colorado, and that he has never, since 1882, voted or exercised any prerogative of said citizenship elsewhere; that he voted since 1892 at Leadville at all elections, city, county and state, except at the spring election of 1896, the elections in 1899 and the spring election of 1900, and that when he did not vote he was reregistered, when his name was dropped for such failure."

Mr. C. C. POST, attorney general, Mr. CLINTON

REED, Mr. JOHN M. WALDRON and Mr. JOHN M. MAX-WELL for relator.

Messrs. PATTERSON, RICHARDSON & HAWKINS, Messsrs. THOMAS, BRYANT & LEE and Mr. HARVEY RIDDELL for respondent.

CHIEF JUSTICE CAMPBELL (after the foregoing statement of facts) delivered the opinion of the court.

The jurisdiction of this court to entertain *quo warranto* proceedings to oust from office a constitutional officer subject to impeachment, is challenged by defendant. It is contended that such officer can be removed only by impeachment proceedings by the general assembly. We shall, however, assume that this court is vested with jurisdiction over the charges herein preferred, and proceed to dispose of the cause on its merits.

It is conceded that in jurisdictions where common law rules and principles of procedure prevail, as is the case in Colorado where original proceedings are brought in the supreme court, the burden of proof in *quo warranto* proceedings instituted by the state is always upon the defendant, to establish his right to hold and enjoy the office constituting the subject matter in controversy; and we think it also true that defendant must with particularity allege all necessary facts, showing not only that he was eligible to the office at the time of his election, but he must also allege and prove all essential facts, showing a continuing right to hold that office down to the time of the institution of the proceeding to oust him.

While the attorney general in the information set forth the facts which he claims show not only that

plaintiff was ineligible to the office, but has not the right at the present time to hold it, still, we apprehend that the real issues in the case are formed by the averments in the plea to the information, and the replication thereto. Applying these rules to the admitted facts, it must appear that defendant's alleged right to hold is clearly established by him, or he will be removed. At the same time, no merely technical interpretation of the language employed in the statement, and no strained construction, should be made, that will operate to deprive him of an office which he has in fact for several months filled.

We have in the foregoing statement given the facts in sufficient detail to obviate any extended discussion of their legal effect, for we have concluded that the statement itself is probably the best vindication of the conclusion which we have reached.

1. The requirement of section 16 of article vi of the constitution, that a person to be eligible to the office of district judge shall, at the time of his election, be an elector within the judicial district, is met by the facts of this case. In *Sharp v. McIntyre*, 23 Colorado, 102, this court held that one is entitled to vote, and is an elector, only where his domicile or legal or constructive residence is, as distinguished from his actual abiding place. We think that the plaintiff's domicile was in Lake county at the time of his election in November, 1900, and, therefore, he was eligible to hold this office. *Jain v. Bossen*, 27 Colo. 423.

2. Section 2 of article xii of the constitution provides that no person shall hold any office or employment of trust or profit under the laws of the state, without devoting his personal attention to its duties. Defendant insists that this means merely that the

one chosen to an office must be responsible for the
discharge of its duties in his own proper person, and
may not transfer the office to another or relieve him-
self from responsibility of his trust; but for a failure
to meet this requirement an abandonment does not
result.   Plaintiff contends that the officer must dili-
gently and faithfully in person execute the duties be-
longing to his office, and be on hand physically at
the place or places where such duties are to be dis-
charged, ready and willing to perform them; and if,
through wilfulness or carelessness, he refuses to per-
form any of its duties for so long a period as reason-
ably to justify the presumption that he does not de-
sire or intend to perform them, he may be held to
have forfeited and abandoned the office.   Whatever
be the meaning of the section and the consequences
of such violation of its mandate as plaintiff argues
has been shown, we are of opinion that defendant
has not been guilty of such a violation as would au-
thorize us to remove him.   It is urged that owing to
his absences from his district, he has not devoted, and
could not devote, his personal attention to his official
duties as an officer should, particularly with respect
to vacation business, but we are not persuaded that
an abandonment can be said to follow from such
facts relating thereto as the record discloses.

3, A more difficult question arises out of the al-
leged violation by defendant of section 29 of article
vi, which says that all (judicial) officers provided
for in the article, excepting judges of the supreme
court, shall respectively reside in the district, county,
precinct, city or town for which they may be elected
or appointed. The word "reside" may, and some-
times does, have different meanings in the same or
different articles or sections of a constitution or stat-

ute, but the direction here, that a district judge shall reside within his district, manifestly was not intended for his convenience, but for the benefit of the people, whose servant he is. Doubtless one, if not the only, object of the section was to compel the officer to maintain his residence where litigants might expeditiously and with as little expense as possible, have access to him for the transaction of official business. Bearing this in mind, it is quite clear that "residence" here means an actual, as distinguished from a legal or constructive, residence, or, its equivalent, domicile; and it is equally certain that, thus far in defendant's second term, he has not complied with this mandatory provision by residing where it commands. This section, however, should be given a reasonable and not a purely technical or literal interpretation. For instance, no one would say that it was necessary for a district judge actually to reside and be physically present in his judicial district every hour, or day, or week, or month, or continuously every year during his term of office. If, however, he has removed his actual residence from his district, and does not purpose to return, or intends to maintain his actual residence outside his district indefinitely, or for any considerable portion of his term, the section would be ignored, the office become vacant, and the incumbent might be ousted because of such misconduct.

Defendant was elected to the office in November of 1900, and entered upon the discharge of his duties on the 8th of January, 1901, and this proceeding was instituted on the 9th of the following September, about eight months after the beginning of his term. The statement of facts shows that the only reason he has not continuously, or at all, maintained his

actual residence within his judicial district, is because
his health is such that it became necessary for him
to be at a lower elevation for as much of the time as
his actual presence was not needed in his judicial dis-
trict for the discharge of his official duties; and it is
only a fair and reasonable construction, we think, of
the admitted facts, to say, and we shall so hold, that
it is his *bona fide* intention, as soon as his health will
permit, which he hopes will soon be realized, to re-
turn to Leadville in his district for the purpose of
there maintaining his actual residence.    It is true
that there is some indefiniteness about this intention
so to restore his actual residence within his district,
and plaintiff argues that it is a shadowy hope and
nothing more, which defendant has, that he may, at
some future and indefinite time there re-establish it.
This indefiniteness arises, however, out of the neces-
sities of the case; but, we think it would be a strained
construction of the language, and a harsh rule to en-
force within eight months after plaintiff's induction
into office, to say that because he had not during that
time on account of the state of his health, actually re-
sided in his judicial district, and because thus early in
his term it is not entirely certain that at some definite
future date he would return there, he should there-
fore be ousted from office. .We do not say that this
indefinite absence or failure to re-establish within his
district, and there maintain his actual residence, or
its maintenance elsewhere, might not be prolonged
for a sufficient time to warrant defendant's removal
from office.    Indeed such flagrant non-compliance
with a condition of official tenure imperative in its
character should be attended by such consequences.
And we also observe that his naked declaration of
intention would not, of itself, be conclusive of the
question,   But we are not disposed, and for the rea-
sons indicated, under the facts as they now appear

to impose such penalty for the remissness that has already occurred in this respect.

We have not hastily or without thorough examination of the able briefs of counsel, followed by full consultation and consideration, reached this conclusion. We are not indifferent to the vigorous argument of counsel for relator that the people of a judicial district have a right to expect and insist upon the maintenance by their district judge of his actual residence at some place within his judicial district, where, at all reasonable times and as cheaply as practicable, access to him may be had by litigants whose business he should, at all seasonable times, be on hand to dispose of as the law directs, and as they have the unquestioned right to demand. And we also appreciate the potency and soundness of the further argument that if an officeholder finds that his health will be impaired, or his life jeopardized, by continuing his residence within his district, he ought at once, after that fact is revealed to him, voluntarily to resign and give way to some one who can comply with the mandatory provision of the organic act. The fact that it is found in the constitution, and that it is mandatory—and all persons will concede that it should be obeyed,—is of itself a sufficient justification for this feeling. And yet the defendant has rights which the court should not ignore. He was legally elected to the office by a plurality of the electors, and it is only because of a material violation of some provision of the constitution or laws, for the violation of which a vacancy in the office is the penalty, that defendant should be removed. And although the rule, as we have said, requires him clearly to show a continuing right to hold, this rule is in entire harmony with another of equal potency, which

is that it is only for some substantial misconduct upon his part that the severe penalty of an ouster should be visited upon him.

The rule heretofore issued to show cause is discharged, and the proceeding dismissed.

*Writ dismissed.*